328 S.E.2d 290 (1985)
313 N.C. 290
MAXTON HOUSING AUTHORITY
v.
Anita McKoy McLEAN.
No. 626A84.
Supreme Court of North Carolina.
April 2, 1985.
*291 Williamson, Dean, Brown & Williamson by Andrew G. Williamson and Andrew G. Williamson, Jr., Laurinburg, for plaintiff-appellee.
Lumbee River Legal Services, Inc. by Phillip Wright, Pembroke, for defendant-appellant.
MARTIN, Justice.
We find that the Court of Appeals erred in affirming the judgments of the district court and therefore reverse the decision of the Court of Appeals.

I.
The defendant, Anita McKoy McLean, became a tenant of the plaintiff, Maxton Housing Authority (Authority) on 1 July 1980. At that time Mrs. McLean was unmarried and lived in the apartment with her two children. She was not required to pay rent to the Authority and received a check from it in the amount of six dollars per month to apply to her utility bills. On 10 October 1981 she married David McLean, who is the father of her children. The marriage was reported to the Authority, as required, and because of the income of David McLean, the rent on her apartment increased to $171 per month effective 1 December 1981. The rent for December was paid. The January 1982 rent in that amount was not paid to the Authority. Effective 1 February 1982 the rent on defendant's apartment decreased to $73 per month because David McLean had been laid off from his job. However, the rent for February and March was not paid to the Authority.
Because of marital difficulties between the defendant and David McLean, they separated, and he moved out of the apartment on 24 March 1982. Although required by court order to pay $40 per week to the defendant for child support, McLean has never made any such payments. Defendant informed the Authority of this change in her domestic situation. Mrs. McLean, who had received Aid to Families with Dependent Children (AFDC) payments prior to her marriage, reapplied for AFDC benefits on 27 April 1982. She received a check for the May payment on 22 June 1982. She had borrowed some money from her parents to help pay her electric bill. However, she did not pay the water and sewer bill and those services were disconnected for nonpayment on 28 May 1982 and remained *292 so until they were restored on 22 June 1982. This was for an unpaid bill of $14.
On 11 March 1982 the Authority instituted a summary ejectment action against defendant for failing to pay "according to rent policy." After judgment was entered for the plaintiff before a magistrate, the case was appealed to the District Court of Robeson County. Meanwhile, another summary ejectment action was commenced against the defendant on 20 July 1982 based upon nonpayment of utilities which resulted in the water and sewer being disconnected; defendant's inaction in this instance was alleged to be a violation of item 7 of the lease. This case also was appealed to the district court. The cases were consolidated for trial in the district court and were heard by a judge without a jury on 9 June 1983. Judgment was entered for the Authority in both cases, and the defendant appealed to the Court of Appeals on 16 June 1983. By its opinion filed 2 October 1984 the Court of Appeals affirmed the judgments of the district court. Judge Becton dissented.

II.
The defendant argues that summary ejectment should not have been entered against her because under the doctrine of necessaries her husband was responsible for the rental payments. As we base our decision upon another theory of law, we do not find it necessary to discuss the doctrine of necessaries nor to determine if it is applicable to the facts of this case.
We find that the public policy of the state and federal governments with respect to public housing for the poor is dispositive of this appeal. In regard to the problem of public housing for the poor, our legislature has declared:
It is hereby declared that unsanitary or unsafe dwelling accommodations exist in urban and rural areas throughout the State and that such unsafe or unsanitary conditions arise from overcrowding and concentration of population, the obsolete and poor condition of the buildings, improper planning, excessive land coverage, lack of proper light, air and space, unsanitary design and arrangement, lack of proper sanitary facilities, and the existence of conditions which endanger life or property by fire and other causes; that in such urban and rural areas many persons of low income are forced to reside in unsanitary or unsafe dwelling accommodations... many persons of low income are forced to occupy overcrowded and congested dwelling accommodations; that these conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the citizens of the State ... these conditions cannot be remedied by the ordinary operation of private enterprise....
N.C.Gen.Stat. § 157-2 (1982). The legislature authorized the creation of housing authorities as a means of protecting low-income citizens from unsafe or unsanitary conditions in urban or rural areas. Powell v. Housing Authority, 251 N.C. 812, 112 S.E.2d 386 (1960).
The purposes of public housing for the poor are implicit in the construction of leases for such housing. We hold that in order to evict a tenant occupying public housing for persons with low incomes for failure to pay rent as called for in the lease, there must be a finding of fault on the part of the tenant in failing to make the rental payment. Upon a showing by the Authority that the rental payment has not been made as required by the lease, it is presumed that the failure to pay the rent is good cause for eviction. The burden thereupon shifts to the tenant to produce evidence to prove a lack of fault on his part in failing to make the rental payment.
We adopt with approval the writing of former Chief Judge Morris for the Court of Appeals:
It has been recently established that a tenant in a federally subsidized low-income housing project enjoys substantial procedural due process rights under the Fifth and Fourteenth Amendments.... Under these decisions, a tenant in a federally subsidized housing project has an *293 "entitlement" to continued occupancy, and to that extent cannot be evicted unless and until certain procedural protections have been afforded him, including notice, confrontation of witnesses, counsel, and a decision by an impartial decision maker based on evidence adduced at a hearing.... It has become apparent that by enacting the rules and regulations implementing the National Housing Act, 12 U.S.C. § 1701 et seq., Congress contemplated "more occupancy entitlement than limited leasehold terms" ... and at least some degree of permanency.... Thus, in their attempt to cure the evils of discriminatory and arbitrary eviction procedures prevalent in federally-subsidized housing, the courts have established a standard of "good cause" as a condition upon which tenancies in public housing may be terminated.
Apartments, Inc. v. Williams, 43 N.C.App. 648, 650-51, 260 S.E.2d 146, 148-49 (1979), disc. rev. denied, 299 N.C. 328, 265 S.E.2d 395 (1980) (citations omitted).
The standard of "good cause" finds support in the policy of the federal government as expressed in the regulations relating to public housing. In the Code of Federal Regulations we find:
(b) Payments due under the lease. (1) The lease shall state the amount fixed as rent, specifying the utilities and quantities thereof and the services and equipment furnished by the PHA without additional cost.
....
(l) (1) That the PHA shall not terminate or refuse to renew the lease other than for serious or repeated violation of material terms of the lease such as failure to make payments due under the lease or to fulfill the tenant obligations set forth in § 966.4(f) or for other good cause.
24 C.F.R. § 966.4(b)(1), (l)(1) (1984). The regulations do not provide for forfeiture of rights under the lease upon failure to pay rent or upon other violations of the terms of the lease by the tenant. Automatic termination of the lease upon breach of a condition of the lease by the tenant is not provided for in the regulations. Nor do the regulations provide for the reservation by the Authority of a right of reentry upon breach of a condition of the lease by the tenant. The lease in this case is in accord with the regulations.
Our holding also finds support in Tyson v. New York City Housing Authority, 369 F.Supp. 513, 518-19 (S.D.N.Y.1974):
Implicit within the concept of due process is that liability may be imposed on an individual only as a result of that person's own acts or omissions....
There must be some causal nexus between the imposition of the sanction of eviction and the plaintiffs' own conduct.
Carrie Hines v. New York City Housing Authority, 67 A.D.2d 1000, 413 N.Y.S.2d 733 (1979), involved the termination of a lease upon a finding of "nondesirability." The New York court held:
It would be shocking to one's sense of fairness to terminate the tenancy of persons who have not committed nondesirable acts and have not controlled those who have committed such acts (Baldwin v. New York City Housing Auth., 65 A.D.2d 546, 408 N.Y.S.2d 948 [2d Dept.,1978]).
67 A.D.2d at 1001, 413 N.Y.S.2d at 735.
In applying these principles to the present case, we do not find good cause for the termination of the lease. The Authority proved the failure of Mrs. McLean to make the rental payments and the water and sewer payment, thus raising a presumption that good cause existed to terminate the lease. However, Mrs. McLean has by uncontroverted evidence rebutted the presumption by proving the lack of fault on her part in failing to make these payments. Initially, no rent was required of Mrs. McLean and her two children. The rent in question was based upon the income of David McLean when he moved into the apartment after marrying defendant. Mrs. McLean still had no income herself. When her husband refused to pay the rent in January, defendant had no income with which to do so. David McLean then lost *294 his job, causing the rent to be decreased to $73 per month. Then defendant was in the anomalous position of being without income with an additional mouth to feed and having her rent increased from zero to $73 a month, all without any fault on her part.
The trial judge erroneously excluded evidence of the defendant that when she attempted to talk with McLean about their unpaid bills, he assaulted her. Defendant then filed criminal charges against him and secured a judgment requiring McLean to pay to her $40 a week for child support. McLean has failed to make any child support payments. The evidence was relevant to show that defendant received no income from her husband.
David McLean moved out of defendant's apartment on 24 March 1982. Before defendant married David McLean she had received AFDC payments as her only income. These were terminated when she married McLean and were not reinstated until June. After McLean left, defendant borrowed money to pay her bills as best she could. She tried to get an extensionof time for the payment of her water bill by showing to the water department staff a letter from the Department of Social Services about the resumption of her AFDC payments, but was unable to obtain an extension. The water was disconnected because of a $14 delinquency.
By this evidence the defendant has carried her burden to rebut the presumption established by the Authority, and it clearly shows that her failure to pay the rent and water bill was without fault on her part. Mrs. McLean has not committed any wrongful acts that resulted in the rent and water bill being unpaid. There is no causal nexus between the eviction of Mrs. McLean and her own conduct. The fault resulting in the failure to pay the rent and water fee rests upon David McLean, not the defendant. The necessary delay in reinstating the AFDC payments also affected defendant's ability to pay the water bill. To eject Mrs. McLean and her two children from their humble abode upon this evidence would indeed shock one's sense of fairness. Such result would contravene the express public policy of the state. N.C.Gen.Stat. § 157-2 (1982).
As stated in N.C.G.S. 157-2, the objectives sought by public housing authorities cannot be achieved by the ordinary operation of private enterprise. Therefore, it should be noted by the bench and bar that the principles set forth in this opinion apply only to leases between public housing authorities and their tenants.
The decision of the Court of Appeals is
REVERSED.
MEYER, Justice, dissenting.
I must respectfully dissent from the majority opinion.
The two cases against Ms. McLean were consolidated for trial in the district court. In Case No. 82-CvD-632 (nonpayment of rent), judgment was entered in favor of the plaintiff awarding to the plaintiff a money judgment in the amount of $332.00 and ordering that the defendant be removed from the premises and that the plaintiff be put in possession. In Case No. 82-CvD-1482 (nonpayment of utilities), judgment was entered in favor of the plaintiff ordering that the defendant be removed from the premises and that plaintiff be put in possession. The Court of Appeals affirmed both judgments of the district court.
Before this Court, it is not disputed that the rent due to the plaintiff under the lease was $171.00 per month for the months of December 1981 and January 1982, and the rent due for February 1983 and March 1983 was $73.00 per month. It is not disputed that the rent was not paid for the months of January, February or March 1983, and that the rent remained unpaid at the conclusion of the trial. Paragraph 12.1 of the lease specifically provides that "nonpayment of rent" is a material non-compliance with the lease and is grounds for termination of the lease.
The payment of utilities, like the payment of rent, is a requirement stated in the lease which must be complied with by the tenant if the right of occupancy is to continue. *295 The wisdom of having such a provision as a requirement is clear. A dwelling without utilities such as water, sewer or electricity, certainly creates a situation where "unsafe and unsanitary dwelling accommodations" would existthe very problems identified and sought to be corrected by the Housing Authority's law in North Carolina. See N.C.G.S. § 157-2. It is not disputed that the water and sewer services were cut off for nonpayment for a period from 28 May 1982 until 22 June 1982. There is no argument that the rent and the utilities were not paid. Neither is there an argument that nonpayment of the rent and utilities is not proper grounds for termination of the lease, nor that an action in summary ejectment was not a proper remedy for the plaintiff to pursue. These represent material violations of the lease and clearly they are grounds for termination of the lease and were the bases for these actions in summary ejectment. The only argument is that the defendant tenant should not have been required to pay the rent and utilities in arrears because it was not her fault that she could not pay them when due.
I have no difficulty with the "good cause" requirement as a condition upon which tenancies in public housing may be terminated, I simply believe that the record before us reflects good cause for termination. However, even if I felt that the good cause requirement had not been met in this case, I could not support the majority's unnecessary and unwise engrafting upon the "good cause" principle a requirement that the Housing Authorities of this State must establish "fault" on behalf of the tenant before they can terminate the tenancy.
I believe the majority's holding with regard to a requirement of a showing of "fault" has resulted from its mistaken interpretation that the "good cause" requirement somehow incorporates the concept of "fault." Good cause to terminate and fault on behalf of the tenant are not synonymous and need not coexist. It is not difficult to envision the occurrence of situations in which a showing of fault should not be a prerequisite for ejectment. For example, the continued use of the leased premises in which the water and sewer utilities have been cut off for nonpayment may be expected to cause such unsanitary conditions so as to endanger the other tenants and thus furnish good cause for eviction, even though the tenant's failure to pay is not a result of "fault." Fortunately, here, the tenant had somewhere else to live temporarily and voluntarily vacated the premises during the period in which the utilities were discontinued. That of course will not always, nor even in the majority of these situations, be the case.
I am certain that the majority would be quick to respond that this is not at all what is intended by the holding in this case. Noting that the majority has made the same holding with regard to the failure of this tenant to pay her water and sewer utilities as it has to her failure to pay rent, I would simply point to the broad language of the majority's holding: "We hold that in order to evict a tenant occupying public housing for persons of low income for failure to pay rent (water and sewer utilities) as called for in the lease, there must be a finding of fault on the part of the tenant in failing to make the rental (utilities) payment." (Emphasis and matter within parentheses added). The majority has made this same holding with regard to the failure of this tenant to pay her water and sewer utilities.
The majority, after reciting evidence tending to show that it was through no fault of Ms. McLean that she had no money to pay the utilities, has held that "Ms. McLean has not committed any wrongful acts" that resulted in nonpayment of the water and sewer bills and therefore there is "no causal nexus between the eviction of Ms. McLean and her own conduct." The prospect of the application of this reasoning to other factual situations is disquieting. Would this same reasoning prevent a Housing Authority from evicting a tenant who may innocently be totally unable to control conduct of her family members which is totally unreasonable and results in *296 continuing danger or annoyance to the other tenants? I am convinced that it is unwise to establish a requirement of a showing of fault on the part of a public housing tenant as a prerequisite to termination of a lease.
Again, even if I agreed with the result reached by the majority, I believe this case could have, and should have, been decided on the basis of the existing "good cause" principle rather than by establishing a new "fault" principle. I also find it curious that the majority has found it necessary to establish fault on the part of the absentee husband who was not a party to the lease.
In summary, I would point out that if inability to oust tenants for nonpayment of rent or utilities or for other reasons because fault cannot be shown becomes a chronic problem in public housing it will create hardship for the Housing Authorities which may not receive adequate funds in a timely manner to retire the debt issued to construct the housing units. It will likewise create hardship for those prospective tenants on the waiting lists for public housing who can and will comply with the terms of the standard Housing Authority lease. Housing which prospective tenants might receive will be tied up by tenants who do not comply with conditions of the lease through no fault of their own.
For all of the foregoing reasons I would vote to affirm the decision of the Court of Appeals.
BRANCH, C.J., joins in this dissenting opinion.